**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 17-cv-01602

JOSE TREJO;
MARISOL TREJO;
OBDULIA JULIE CORTES;
VILMA DE JESUS ALVARENGA CARRANZA; and those similarly situated

       Plaintiffs,

v.

XCLUSIVE STAFFING, INC.;
XCLUSIVE MANAGEMENT, LLC D.B.A. XCLUSIVE STAFFING;
XCLUSIVE STAFFING OF COLORADO, LLC;
DIANE ASTLEY; and
WESTIN DIA OPERATOR, LLC,

       Defendants.

---

## CLASS AND COLLECTIVE ACTION COMPLAINT

---

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under state law.

2.     Venue is proper pursuant to 28 U.S.C. § 1391 because all Defendants reside in Colorado or are registered to do business in Colorado.

## PARTIES

3.     At all times material to the allegations of the complaint, Plaintiffs were domiciled in the District of Colorado.

4.      Plaintiffs each signed written consents to be a named Plaintiffs in a Fair Labor Standards Act collective action and the signed consents are attached to this Complaint as Exhibit 1.

5.      At all times material to the allegations of the complaint, Defendant XCLUSIVE STAFFING, INC. (hereinafter "Xclusive") was a Colorado corporation with its principal place of business in the District of Colorado.

6.      At all times material to the allegations of the complaint, Defendant XCLUSIVE MANAGEMENT, LLC D.B.A. XCLUSIVE STAFFING (hereinafter "Xclusive Management") was a Colorado limited liability company with its principal place of business in the District of Colorado.

7.      At all times material to the allegations of the complaint, Defendant XCLUSIVE STAFFING OF COLORADO, LLC (hereinafter "Xclusive Colorado") was a Colorado limited liability company with its principal place of business in the District of Colorado.

8.      At all times material to the allegations of the complaint, Defendant WESTIN DIA OPERATOR, LLC, (hereinafter "Westin") was a Delaware corporation registered to do business in Colorado.

9.      At all times material to the allegations of the complaint, Defendant Astley was a natural person domiciled in the District of Colorado.

## STATEMENT OF FACTS

### I.      Xclusive's Operations

10.     Xclusive is a staffing agency based in Colorado that is 100 percent owned by Defendant Astley.

11.     Xclusive's corporate headquarters is in Westminster, Colorado.

12.     Through subsidiary entities, Xclusive operates in at least 11 states.

13.     Xclusive operates separate subsidiaries in Colorado, New Mexico, Texas, Kansas,

Louisiana, Indiana, Tennessee, Kentucky, Ohio, Hawaii, and Florida.

14.     Xclusive uses Xclusive Management to manage these state subsidiaries and their

employees.

15.     Xclusive Colorado is a Colorado subsidiary of Xclusive.

16.     All these entities are under common control because they are all 100 percent owned and

operated by Defendant Astley.

17.     All these entities are also a unified operation because they are all advertised as a single

operation at www.xclusivestaffing.com, and they all do business as Xclusive Staffing.

18.     All the entities provide low-wage workers for their clients. Most of Xclusive's clients are

hotels. But Xclusive also provides workers to other types of clients, including convention

centers, timeshares, warehouses, stadiums, hospitals, office buildings, catering companies,

amusement parks, and schools.

19.     Xclusive describes itself as follows on its website:

> In 2002, Xclusive Staffing began as a small Denver-based firm
> specializing in housekeeping services for local hotels. Xclusive
> Staffing was born out of our experience as "the user" of temporary
> staffing agencies. With many years of hotel experience among us,
> our executives and managers understood the challenges of working
> with outside staffing firsthand. Based on our past struggles we
> collectively created a unique model of providing quality employees
> centered on the client's needs.
>
> The past 13 years have proved that our vision of creating a new
> model of staffing was sorely needed. Xclusive Staffing has
> expanded from one location to 25 regional offices in 11 states
> largely on our reputation of doing things differently than the
> "typical staffing agency." We are a 100% female-owned

> company and remain committed to the highest levels of integrity in our business. We treat our employees with respect and in turn they deliver top-notch customer service.
>
> We are trailblazers in our industry because we share the same values as our clients when it comes to staffing. Our focus on quality, consistency, and reliability has allowed us to build long-term partnerships. We understand the pressure that hoteliers face every day and we want to be that partner you can count on. We speak and understand the same "language" that hoteliers speak regarding standards, guest expectations, and competition.
>
> Now, Xclusive Staffing is the industry leader and trusted partner of hundreds of clients across the country. As the preferred partner of multiple national hotel brands, facilities management companies and hotel management companies, we are excited to share our passion with you. We care about your challenges like they are our own because we have been in your shoes.

20.    Xclusive's operations throughout the country are controlled centrally out of its Westminster, Colorado headquarters. The branch offices fax and email timesheets and employee paperwork to the corporate office, and the corporate office sends payroll checks by FedEx to the branch offices weekly.

21.    In an enforcement action ending in January of 2014, the United States Department of Labor's Wage and Hour Division found that Ms. Astley sets policies regarding wages across Xclusive's branches.

22.    All pay stubs issued to every employee out of every branch are issued by Xclusive or one of its subsidiaries.

23.    Pay checks issued by Xclusive and its subsidiaries are signed by Defendant Astley.

**II.    Plaintiffs' Employment by Defendants**

**A.  Jose Trejo's Employment**

4

24.     Jose Trejo entered an employment contract with Xclusive in approximately the fall of 2015 and continued to work for Xclusive until approximately the winter of 2017. A material term of the employment contract was that Mr. Trejo was to be paid an hourly rate for all hours worked.

25.     During that time, Mr. Trejo worked at the following locations that were clients of Xclusive or one of its subsidiaries:

      i.      Westin DIA

      ii.     The Colorado Convention Center

      iii.    Hyatt Denver Tech Center

      iv.     Hyatt Regency Denver at the Colorado Convention Center

      v.      Omni Interlocken

      vi.     Crowne Plaza Denver Airport Convention Center

      vii.    Renaissance Denver Stapleton

      viii.   First Bank Stadium

      ix.     Sports Authority Field at Mile High

      x.      Dick's Sporting Good's Park

26.     At these client locations, Mr. Trejo performed a variety of jobs, including cook, dishwasher, waiter, housekeeper, and janitor.

27.     During his entire time working for Xclusive, Mr. Trejo remembers frequently working more than 40 hours per week.

28.    Mr. Trejo specifically remembers working more than 40 hours in many weeks during his time working at the Westin DIA. There, Mr. Trejo remembers consistently working overtime in May of 2016.

29.    During those May 2016 workweeks, Mr. Trejo was scheduled for less than 40 hours per week, but he was forced to work for more than the scheduled hours and was only compensated for the scheduled hours.

30.    Xclusive did not compensate Mr. Trejo for the difference between the hours scheduled and the hours he actually worked.

31.    Mr. Trejo also remembers working more than 40 hours per week during a month in the fall of 2015 at the Grand Hyatt. During that time, He usually worked 8 hours or more a day, 7 days a week.

32.    Mr. Trejo rarely received breaks when he worked for Xclusive.

33.    Despite rarely receiving a break, Xclusive deducted 30 minutes from every work day's work time for 30-minute lunch breaks that Mr. Trejo rarely (if ever) took.

34.    This happened at every Xclusive client location where Mr. Trejo worked.

35.    At Westin DIA, Mr. Trejo rarely received any breaks, including the 10 minute breaks for each 4 hours worked required under Colorado law. Despite this, he would still have 30 minutes of worktime deducted from every day as if he had taken a 30-minute break every day.

36.    Xclusive automatically deducted 30 minutes of Mr. Trejo's worktime for every day Mr. Trejo worked in May 2016, when he was working at the Westin DIA, even though Mr. Trejo rarely if ever received any breaks.

37. During his time working at the Westin DIA, Mr. Trejo did not take 30-minute breaks even though this time was deducted from every one of his workdays.

38. During his time working at the Westin DIA, Mr. Trejo did not receive 10 minute breaks for every 4 hours worked.

39. Xclusive also automatically deducted 30 minutes of worktime from every day Mr. Trejo worked during a week in the winter of 2016 even though Mr. Trejo did not take a 30-minute break during that week.

40. As a result, these checks are missing 30 minutes of work time for most or all of the work days for that workweek.

41. That week, Mr. Trejo received two pay checks from Xclusive that together included more than 40 hours of work but that did not include overtime premiums. *See infra* at ¶¶ 120-21.

42. Xclusive deducted $3 deducted from every paycheck paid to Mr. Trejo, including paychecks for weeks when he worked overtime.

43. Xclusive deducted $3 was from the paychecks they paid Mr. Trejo for the workweeks described above in May 2016, the fall of 2015, and the winter of 2016.

   **B.  Ms. Trejo was Employed by Xclusive**

44. Marisol Trejo (Jose Trejo's sister) entered an employment contract with Xclusive in approximately the winter of 2015 and is currently working for Xclusive under that contract. A material term of the employment contract is that Ms. Trejo is paid an hourly rate for all hours worked.

45. During this time, Ms. Trejo has worked at the following Xclusive locations that are or have been clients of Xclusive or one of its subsidiaries:

i.     Westin DIA

   ii.    The Colorado Convention Center

   iii.   Hyatt Denver Tech Center

   iv.    Hyatt Regency Denver at the Colorado Convention Center

   v.     Omni Interlocken

   vi.    Crowne Plaza Denver Airport Convention Center

   vii.   First Bank Stadium

   viii.  Sports Authority Field at Mile High

   ix.    Dick's Sporting Good's Park

46.    At these client locations, Ms. Trejo has worked as a food preparer, dishwasher, launderer, and janitor.

47.    At Westin DIA, she was a dishwasher and prepared food.

48.    Ms. Trejo frequently has worked in excess of 40 hours in a week for Xclusive.

49.    When Ms. Trejo started working for Xclusive, she worked more than 40 hours almost every week.

50.    During that time, she typically worked at the Colorado Convention Center, Sports Authority Field, Grand Hyatt, and Firstbank Stadium. She would typically work more than 8 hours a day and six days a week.

51.    Ms. Trejo still frequently works more than 40 hours in a week during weeks she works for Xclusive.

52.    Ms. Trejo worked significant overtime during December 2016. During that time, Ms. Trejo typically worked 6 days per week for approximately 8 hours per day.

53.     Ms. Trejo also worked overtime during the week of April 24, 2017, when Ms. Trejo worked six days for approximately eight hours a day. During that week, Ms. Trejo worked 4 days at Westin and 2 nights at the convention center.

54.     Despite frequently working overtime Xclusive rarely has paid Ms. Trejo for all of her worktime. Instead, Xclusive has often paid her for 40 hours of work, or some amount less than 40 hours, even though she worked more.

55.     Ms. Trejo rarely took or received breaks during her entire time working for Xclusive, including the 10 minute break for every 4 hours of work required under Colorado law.

56.     At Westin DIA, Ms. Trejo would not receive any break at all. During the week of April 24, 2017 Ms. Trejo received no breaks at all.

57.     Even though Ms. Trejo has rarely taken breaks, Xclusive subtracted 30 minutes of worktime from Ms. Trejo's work hours for every day that she worked. This 30-minute deduction purportedly accounted for a daily 30-minute break, but this break was rarely given or taken.

58.     As a result, every check Ms. Trejo received from Xclusive is missing 30 minutes of work time for most or all of the work days for the workweek. This includes the checks for overtime workweeks, like the April 24, 2017 workweek and the December 2016 workweeks.

59.     Xclusive also deducted $3.00 from each of Ms. Trejo's paychecks. This includes the checks for overtime workweeks, like the April 24, 2017 workweek and the December 2016 workweeks.

60.     Additionally, Xclusive made many other deductions from Ms. Trejo's pay checks. For example, Xclusive frequently deducted for the cost of uniforms or name tags that they required Ms. Trejo to wear during work.

### C. Ms. Cortes was Employed by Xclusive

61.     Obdulia Julie Cortes entered into an employment contract with Xclusive in approximately 2001 and is currently working for Xclusive under that contract. A material term of the employment contract is that Ms. Cortes is paid an hourly rate for all hours worked.

62.     During that time, Ms. Cortes has worked at the following locations that are or have been clients of Xclusive or one of its subsidiaries:

       i.      Westin DIA

      ii.     The Colorado Convention Center

    iii.     Hyatt Denver Tech Center

     iv.    Hyatt Regency Denver at the Colorado Convention Center

      v.    Omni Interlocken

     vi.    Crowne Plaza Denver Airport Convention Center

    vii.    Flea Market on 88th and Quebec

   viii.    Grand Hyatt on 17th and Welton

    ix.    Hyatt Place on 14th and Glenarm

     x.    Ritz Carleton on Arapahoe and 19th

    xi.    Marriot at Bellview

    xii.    Marriot on 18th

   xiii.    Renaissance Denver Stapleton

   xiv.    Sports Authority Field at Mile High

63.     At these client locations, Ms. Cortes prepared food and sometimes served food to patrons.

64.     Ms. Cortes frequently worked in excess of 40 hours in a week.

65.     Ms. Cortes specifically remembers working more than 40 hours in a week during the week of April 24, 2017. During that week, Ms. Cortes' paystub reflected 46 hours at Crowne Plaza DIA.

66.     Ms. Cortes also remembers working more than 40 hours in a week during spring and summer of 2016 at the Westin DIA. During that time, Ms. Cortes typically worked 8-10 hours of overtime every week.

67.     During her entire time working for Xclusive, Ms. Cortes rarely received any breaks, including the 10 minute break for every 4 hours of work required under Colorado law.

68.     Nonetheless, Xclusive deducted 30 minutes from Ms. Cortes's worktime for every day that Ms. Cortes worked for a break that was rarely given or taken.

69.     As a result, every check Ms. Cortes received from Xclusive is missing 30 minutes of work time for most or all the work days for the workweek. This includes the checks for overtime workweeks, like the April 24, 2017 workweek and the workweeks in the spring and summer of 2016 at Westin DIA.

70.     Additionally, Xclusive has deducted $3.00 from every one of Ms. Cortes's paychecks. This includes the checks for overtime workweeks, like the April 24, 2017 workweek and the workweeks in the spring and summer of 2016 at Westin DIA.

71.     Ms. Cortes's paychecks also contain several additional deductions, including for criminal background checks, blue shirts that Xclusive employees are required to wear, and name tags.

   **D.  Ms. Alvarenga was Employed by Xclusive**

72. Ms. Alvarenga entered into an employment contract with Xclusive in approximately 2015 and is currently working for Xclusive. A material term of the employment contract is that Ms. Alvarenga is paid an hourly rate for all hours worked.

73. During that time, Ms. Alvarenga has worked at the following hotels that were clients of Xclusive or one of its subsidiaries:

       i.      Westin DIA

      ii.     The Colorado Convention Center

    iii.    Hyatt Denver Tech Center

    iv.    Hyatt Regency Denver at the Colorado Convention Center

      v.     Omni Interlocken

    vi.    Crowne Plaza Denver Airport Convention Center

   vii.    First Bank Stadium

  viii.   Sports Authority Field at Mile High

74. At these client locations, Ms. Alvarenga worked as a dishwasher, janitor, and sometimes has done laundry or prepared food.

75. At Westin DIA, she was a dishwasher and did laundry.

76. Ms. Alvarenga frequently worked more than 40 hours in a week.

77. Specifically, Ms. Alvarenga remembers working more than 40 hours a week during a workweek in April 2017.

78. During that workweek, Ms. Alvarenga worked at the Westin DIA and the Crowne Plaza Airport Convention Center. She worked 6 days that workweek, with work days that started at 7 am each work day and ended at 3:30 or later each day.

79.     During her entire time working for Xclusive, Ms. Alvarenga rarely received breaks, including the 10 minute break required for each 4 hours worked under Colorado law.

80.     Despite this, Xclusive deducted 30 minutes of work time from each day that Ms. Alvarenga worked at Xclusive for breaks that never occurred.

81.     As a result, every check Ms. Alvarenga received from Xclusive is missing 30 minutes of work time for most or all of the work days for the workweek. This includes the checks for overtime workweeks, like the April 2017 workweek where she worked at Westin DIA and the Crowne Plaza Airport Convention Center and the other workweek in April 2017 where she received two checks totaling more than 40 hours of work with no overtime compensation, *see infra* at ¶¶ 120, 122.

82.     Additionally, Xclusive deducted $3.00 from every one of Ms. Alvarenga's paychecks. This includes the checks for overtime workweeks, like the April 2017 workweek when she worked at Westin DIA and the Crowne Plaza Airport Convention Center and the other workweek in April 2017 when she received two checks totaling more than 40 hours of work with no overtime compensation, *see infra* at ¶¶ 120, 122.

83.     Ms. Alvarenga's paychecks also contain several additional deductions, including for criminal background checks, blue shirts that Xclusive employees are required to wear, and name tags.

### III.     Defendant Westin Controlled Plaintiffs' Work at Westin DIA

84.     Xclusive's clients rely on and help control the work of the workers provided by Xclusive. The USDOL found that Xclusive employees are an integral part of the clients' business activities, providing large numbers of housekeeping, cooking, room attendant, and other

13

operational staff. Moreover, client supervisors take part in training, controlling, and inspecting the work of Xclusive's employees.

85.     Because of this, in every USDOL investigation of Xclusive, Xclusive and the Xclusive client relevant to the investigation were found to be joint employers under the Fair Labor Standards Act.

86.     While Xclusive is responsible for compensating its employees, its employees' work directly benefits Xclusive's clients, and Xclusive's clients compensate Xclusive for providing the employees.

87.     While Xclusive would instruct Plaintiffs which client they would work for on any given day and were responsible for work schedules, agents of Xclusive clients directly controlled how the work of Xclusive employees was completed.

88.     This was true for Plaintiffs at Westin DIA.

89.     There, Mr. Trejo, Ms. Trejo, Ms. Cortes, and Ms. Alvarenga all worked in the kitchen where agents of Westin DIA were often responsible for directly supervising their work.

90.     For example, Mr. Trejo remembers that a cook named Vincente, who worked for Westin DIA, was in charge of his work as a food preparer. Vincente would tell Mr. Trejo what food to prepare and how to prepare it.

91.     Ms. Trejo remembers her work washing dishes being supervised by agents of Westin DIA named Michael and Aaron. They told Ms. Trejo what dishes to wash, how to wash the dishes, when to take out the trash, and when and where to move boxes of kitchen supplies.

92.     Ms. Cortes also experienced control by a chef who was an agent of Westin DIA and managed the kitchen where Ms. Cortes worked as a line cook. The chef would constantly

14

supervise line cooks like Ms. Cortes, telling them what food to prepare and how to prepare it. The control by this chef included how to plate specific dishes and what ingredients to include in specific dishes.

93.     Ms. Alverenga's work at Westin DIA was also supervised by agents of Westin, including an agent named Michael. These agents, including Michael, would supervise her work by, for example, telling her to wash dishes, take out the trash, work several kitchen machines, sweep and mop floors, and what cleaning products to use when washing dishes or sweeping floors.

## IV.    Xclusive's Illegal Pay Practices

94.     Xclusive's website advertises compliance with "federal, state and local laws," and reassures its customers that it takes these laws "extremely seriously" and that "[w]e exceed the industry standards to ensure your protection."

95.     In addition, its website claims that Xclusive has "[f]ull compliance with overtime laws."

96.     Xclusive makes these promises knowing that its clients care about whether Xclsuive's pay practices violate state and federal law because Xclusive's illegal pay practices might subject Xclusive's clients to liability.

97.     Despite these promises, Xclusive knowingly maintains policies that violate state and federal wage and hour laws in at least the following ways:

### A.    The $3.00 Weekly Deduction and Other Deductions Primarily for the Benefit of the Employer (the "$3 Deduction Policy")

98.     Xclusive deducts $3.00 from every one of its workers' paychecks as an administrative charge.

99.     The form contract provided by Xclusive to all workers, including Plaintiffs, states that this $3 is deducted from every weekly paycheck of every Xclusive employee.

100.   Xclusive also deducts other expenses from wages that are primarily for the benefit of the employer, including clothing, name tags, criminal background checks, and tools or other equipment necessary for the employee's work.

101.   A 2011 enforcement action against Xclusive by the USDOL Wage & Hour Division in Texas found that Xclusive "deducted $3.00 per paycheck as a processing fee and made other deductions for things such as uniforms, name badges and background checks."

102.   The $3.00 deduction provides a benefit to Xclusive, not to Plaintiffs.

103.   Based on information and belief, the average cost to an employer of issuing a payroll check is less than $3.00 per check. Therefore, the amount of the deduction exceeds the cost of the administrative tasks involved in issuing checks to the workers.

**B. Automatic 30Minute Deductions for Breaks that Rarely Occur (the "30-Minute Deduction Policy")**

104.   At every Xclusive client where Plaintiffs worked, Xclusive automatically deducted 30 minutes from work time each day, irrespective of whether workers actually took a 30-minute break.

105.   Plaintiffs rarely received breaks, but Xclusive still always deducted 30 minutes from each work day as if Plaintiffs had taken 30-minute breaks.

106.   As a result, Plaintiffs were left uncompensated for 30 minutes of work on most work days.

107.   Mr. Trejo knows that 30 minutes was deducted from every day regardless of whether a 30-minute break occurs because Dulce, an Xclusive agent that handled missing time, told him that Xclusive took out that time.

108.    Dulce explained that it was company policy to deduct 30 minutes from every Xclusive worker's time each day regardless of whether the employee ever took the break.

109.    She explained that these were orders from Eloy (the president of the company) and Defendant Astley.

110.    When Mr. Trejo complained to Claudia, an Xclusive manager, about the 30-minute deduction policy, she said, "I have to take out the break. That's policy, and that's it."

111.    When Mr. Trejo complained to Eloy about the 30-minute deduction policy at the Xclusive's corporate office in Westminster, Eloy claimed that the 30 minutes had to be deducted at every jobsite because it is the law. This meeting happened in the summer of 2016.

112.    Ms. Trejo frequently complained to agents of Xclusive about the 30-minute deduction policy.

113.    When Ms. Trejo first started working at Xclusive, her manager, Pedro, told her that 30 minutes were deducted from each workday whether she worked during those 30 minutes or not. Ms. Trejo called to complain that hours were missing from her paycheck and Pedro explained that the missing hours were because of the 30-minute deductions, and there was nothing he could do.

114.    A 2012 enforcement action against Xclusive by the USDOL Wage & Hour Division at the Grand Hyatt in Denver Colorado found that Xclusive "did not count missed lunch breaks" as work time.

115.    A 2014 enforcement action against Xclusive by the USDOL Wage & Hour Division at the Hampton Inn & Suites in Denver Colorado found that lunches were "auto-deducted even when the employee worked."

116.    The result of not deducting time for meal breaks that never actually occurred, and during which Plaintiffs and those similarly situated worked, is that the wage payments for Plaintiffs and those similarly situated did not reflect all the time worked.

### C.  Failure to Provide 10-Minute Breaks (the "10-Minute Break Policy")

117.    The Colorado Wage Order provides that "[a] compensated ten (10) minute rest period for each four (4) hours or major fractions thereof shall be permitted for all employees."

118.    Plaintiffs rarely received any breaks, including the breaks required under Colorado law.

119.    As a result of not being provided the 10-minute breaks, Plaintiffs and those similarly situated were not paid for 10 minutes of time that they should have been paid for during each 4 hours they worked without a break.

### D.  Providing Two Checks to Avoid Overtime (the "Two Check Policy")

120.    Ms. Alvarenga and Mr. Trejo also sometimes received two separate checks from Xclusive for one week of work. The total hours worked during these weeks exceeded 40 hours, but each of the two checks would reflect less than 40 hours, with the total hours equaling more than 40 hours. Neither of the two checks would compensate for overtime at time and a half.

121.    For example, for one workweek in the winter of 2016, Mr. Trejo remembers receiving one pay check for work done at the Westin DIA and another paycheck for Convention Center work. During that workweek, Mr. Trejo worked more than 40 hours during that week, but worked less than 40 hours at the Westin DIA and less than 40 hours at the Convention Center. Neither of the checks treated any of the hours as overtime hours. The result was that Mr. Trejo was compensated at straight pay for more than 40 hours of work and received no overtime.

122.    Similarly, in a workweek in April 2017, Ms. Alvarenga worked more than 40 hours and received two pay checks with no overtime pay. During that workweek, Ms. Alvarenga worked 16 hours at the Colorado Convention Center, 16.85 hours at an Xclusive client called Centerplate (a caterer at the Colorado Convention Center), and 16.67 hours at the Westin DIA, for a total of approximately 49.5 hours of work. Ms. Alvarenga received one pay check for her work at the Colorado Convention Center and Centerplate, and another pay check for the rest of her work. Neither check compensated any of her work hours at an overtime rate. The paystubs for these pay checks are attached as Exhibit 2.

## V.    The USDOL Wage & Hour Division Investigations

123.    Xclusive has been investigated several times by the USDOL Wage & Hour Division for minimum wage and overtime violations.

124.    Below is a table summarizing USDOL Wage & Hour Division's recent history with Xclusive:

| Year | Location | Finding |
|------|----------|---------|
| 2011 | Albuquerque, NM | Minimum Wage and Overtime Violations |
| 2011 | Grapevine, TX | Minimum Wage, Overtime, and Recordkeeping Violations |
| 2012 | Tampa, FL | Minimum Wage Violation |
| 2012 | Denver, CO | Minimum Wage, Overtime, and Recordkeeping Violations |
| 2014 | Denver, CO | Overtime and Recordkeeping Violations |

## VI.    Xclusive's Pattern of Racketeering

### A.  The Astley Enterprise

125.    As the Owner of Xclusive, Defendant Astley formed an association-in-fact with Xclusive and all of its associated entities and subsidiaries, which shall be referred to as the "Astley Enterprise."

126.    In the alternative, Xclusive and all of its associated entities and subsidiaries formed and association-in-fact called the "Astley Enterprise."

127.    The USDOL Wage and Hour Division found that Ms. Astley is "involved in the daily operations of [Xclusive]."

128.    Ms. Astley owns, operates, and controls 100% of Xclusive and all of its associated entities and subsidiaries.

129.    In conducting their illegal racketeering scheme, the enterprise acted with the common purpose of maintaining their business and attracting clients with the promise that Xclusive paid its workers in compliance with federal and state wage-and-hour law, even though Xclusive knew that its pay practices violated federal and state wage-and-hour law.

130.    Defendant Astley used the enterprise to effect this scheme.

131.    Because of her sole ownership of Xclusive, Defendant Astley has personally profited from the fraudulent scheme through Xclusive's increased profits resulting from the racketeering.

### B. The Xclusive Enterprise

132.    Xclusive formed an association-in-fact with its clients, including Defendant Westin, called the "Xclusive Enterprise."

133.    Xclusive's clients used Xclusive as a source of low-wage labor to staff their businesses. In conducting the illegal racketeering scheme through the Xclusive enterprise, Xclusive attracted clients with the promise that Xclusive paid its workers in compliance with federal and state

wage-and-hour law, even though Xclusive knew that its pay practices violated federal and state wage-and-hour laws.

134.     Xclusive used the enterprise to effect this scheme.

      **C. Wire and Mail Fraud Schemes and Their Resulting Harm to Plaintiffs and the Class**

135.     Both the Astley Enterprise and the Xclusive Enterprise engaged in four interrelated wire fraud schemes: (1) the USDOL scheme, (2) the website scheme, (3) the electronic timekeeping scheme, and (4) the faxed timesheet scheme.

136.     Both on their own and together, these schemes comprise patterns of racketeering activity.

      **a.  The USDOL Scheme**

137.     In a 2012 investigation by the USDOL Wage and Hour Divisions Denver District Office of Xclusive's operations at the Grand Hyatt, Denver, the USDOL found an illegal policy of automatic 30-minute deductions for lunch. As part of that investigation, Ms. Astley met with the USDOL Investigator on June 27, 2012 and was told that Xclusive had "failed to count missed lunch breaks" as work time.

138.     According to the USDOL, at this meeting, Ms. Astley "agreed to comply by making sure that all employees are paid at time and one-half the employee's regular-rate of pay after 40 hours in a workweek and by making sure that the Grand Hyatt and Xclusive compensate employees for all their hours worked." Ms. Astley blamed Xclusive's client—Grand Hyatt—for the practice.

139.     Despite Ms. Astley's attempt to blame Grand Hyatt, a DOL investigator found that Xclusive "employees have missed lunch breaks that Grand Hyatt employees did not have." That is, at the Grand Hyatt non-Xclusive employees only recorded unpaid lunch breaks when they

actually took breaks, whereas Xclusive recorded unpaid lunch breaks for Xclusive workers whether or not those workers took their lunch breaks.

140.    In 2014, the USDOL found that Xclusive was automatically deducting lunch breaks at another hotel. At the close of the investigation, the DOL held a 2/24/14 meeting with Ms. Astley at the Denver District Office of the USDOL Wage and Hour Division. According to the USDOL, "Ms. Astley stated that Xclusive never automatically deducted lunches." After the investigator showed Ms. Astley records showing that every employee was off the clock from exactly 12:00pm to 12:30pm, Ms. Astley again blamed Xclusive's client – this time Hampton Inn & Suites – for the practice.

141.    The automatic lunch break deductions, and the resulting underpayment of Xclusive employees, were the consequence of Xclusive's intentional pay practices. Particularly in light of the number of investigations by the USDOL, Ms. Astley's representations to the USDOL were fraudulent, and she knew or should have known that they were fraudulent.

142.    Moreover, despite Ms. Astley's promises to the USDOL, these illegal pay practice practices continued after the USDOL investigations.

143.    The USDOL relied on Ms. Astley's fraudulent promises regarding the meal deductions in deciding its dispositions, and Plaintiffs and those similarly situated were harmed because, as a result of the fraud, Xclusive was able to continue its illegal pay policies.

144.    The Astley Enterprise and the Xclusive Enterprise used the mail and wires in furtherance of the fraudulent scheme directed toward the DOL by transmitting fraudulent pay records and checks between Xclusive branches, and Xclusive employees and clients. These fraudulent pay

records indicated, among other things, that Xclusive workers had taken 30 minute unpaid breaks when, in fact, the workers generally worked during these unpaid periods.

145.    The Astley Enterprise and the Xclusive Enterprise used the mail and wires each week to send time records to its corporate office in Westminster, Colorado and to send the resulting pay checks back to its branch offices.

146.    In the 2012 USDOL investigation of Xclusive in Denver, the USDOL found that Xclusive "routinely faxes/emails timesheets and new-hire paperwork from branch offices (located in other states) to the corporate office and the corporate office sends payroll checks by FedEx to the branch offices weekly."

147.    The Astley Enterprise communicated with the USDOL Wage and Hour Division by wire and or mail during the course of investigations by the USDOL into Xclusive's wage-payment practices. Ms. Astley is listed as a contact by the USDOL for Xclusive in the documents related to these investigations, along with her phone number, cell phone number, fax number, and email address.

148.    Specifically, the Astley Enterprise continually and repeatedly made material and false representations to the USDOL Wage and Hour Division after investigations by that agency found violations of wage and hour laws.

149.    The Astley Enterprise made these fraudulent statements despite knowingly and intentionally implementing policies that violated state and federal wage and hour laws.

### b. The Website Scheme

150.    The Astley Enterprise and Xclusive Enterprise use the internet to fraudulently advertise Xclusive's compliance with state and federal minimum wage laws.

151.    Specifically, Xclusive's website currently advertises that Xclusive "exceed[s] industry standards" in complying with "federal, state and local laws."

152.    From at least 8/2/2010 to 3/6/2015, Xclusive's website claimed "[c]ompliance with all federal, state and local labor laws" in advertising "Why Xclusive Staffing?" to potential clients.

153.    Not only does this knowingly and intentionally false assurance allow Xclusive to recruit employees, it also serves to reassure current and potential clients who confront the risk of being held jointly and severally liable for Xclusive's wage-and-hour violations.

154.    Because of the false assurances made by the Astley Enterprise and the Xclusive Enterprise over Xclusive's website, clients are more likely to contract with Xclusive, allowing Xclusive to maintain its illegal pay policies, which have harmed Plaintiffs.

### c.    The Electronic Timekeeping Scheme

155.    Xclusive maintains records of employee work hours for its various clients on online electronic time keeping systems, including its proprietary platform, StaffTraxs.com, and a third-party platform, WorkRecords.com.

156.    Xclusive has advertised for Property Managers on its website that will manage their employees at client locations. The Property Managers must be able to "[m]anage all timekeeping systems including but not limited to manual timesheets, StafftraXS and WorkRecords."

157.    On its online "Client Center," Xclusive provides a link to its StaffTraxs.com system where a client can go if it is "[l]ooking to view [its] employees [sic] hours." StraffTraxs.com provides Justin Astley's name and phone number as a technical support contact. Justin Astley is a vice president at Xclusive.

158.    Until at least March 2, 2015, the Xclusive website advertised StaffTraXS to its clients as

follows: "Xclusive Staffing is pleased to offer our clients the easiest and most user-friendly

timekeeping solution in the industry.  Designed in house, StafftraXS is built specifically for the

needs of the hospitality industry making it far superior to other options available. StafftraXS is

indicative of Xclusive's commitment to leading the industry and making our client's jobs easier

everyday."

159.    In a different wage-and-hour action against Xclusive in the District of Colorado, different

Plaintiffs, who were former Xclusive employees, filed an amended complaint with

WorkRecords.com time sheets for Xclusive workers at the Omni Interlocken attached as

Exhibits. *See Cota Martinez et al v. Xclusive Management LLC et al.*, 15-cv-00047 (D. Colo.),

ECF Docs. 39-6, 39-8, & 39-10. The WorkRecords time sheets reflect automatic 30-minute

breaks.

160.    Both Xclusive and its clients have access to and use these platforms, and therefore the

Astley Enterprise and Xclusive Enterprise use these online platforms to make repeated,

intentionally-false statements over the wires regarding employee work hours.

161.    In particular, as alleged elsewhere, Xclusive's records for employee work hours

consistently report 30-minute breaks that employees rarely take, notwithstanding that Xclusive

and Defendant Astley know that this practice violates wage-and-hour laws.

162.    By underreporting employee work hours to clients over the wires, the Astley Enterprise

engages in repeated acts of wire fraud that harm Plaintiffs and putative class members by giving

clients the false impression that Xclusive's workers work less time than they actually work.  This

enables Xclusive to either (1) charge clients less than it would if it truthfully recorded and

reported work hours or (2) retain profits that would otherwise flow to employees if it truthfully recorded and reported work hours.

### d. The Faxed Timesheet Scheme

163.    Xclusive also sometimes uses handwritten time sheets to record employee time at client locations.

164.    Both Xclusive and its clients have access to, and use, these timesheets and therefore the Astley Enterprise and Xclusive Enterprise use these timesheets to make repeated, intentionally-false statements over the wires regarding employee work hours.

165.    The onsite Xclusive supervisor typically enters the time information on the timesheets and then, per the instructions on the timesheets, the client signs the timesheets and returns them by fax to Xclusive.

166.    In particular, as alleged elsewhere, Xclusive's records for employee work hours consistently report 30-minute breaks that employees rarely take, notwithstanding that Xclusive and Defendant Astley know that this practice violates wage-and-hour laws.

167.    These timesheets are for single days and must be returned within a day of the time recorded on the sheets. Thus, each client using the timesheets has to transmit a separate fax for each day it used Xclusive workers.

168.    By using the wires to transmit underreported employee work hours, the Astley Enterprise and Xclusive Enterprise engage in repeated acts of wire fraud that harm Plaintiffs and putative class members by giving clients the false impression that Xclusive's workers work less time than they actually work.  This enables Xclusive to either (1) charge clients less than it would if it

truthfully recorded and reported work hours or (2) retain profits that would otherwise flow to employees if it truthfully recorded and reported work hours.

## **RULE 23 CLASS ALLEGATIONS**

169.    Plaintiffs allege all claims, other than the FLSA claims, as a Fed R. Civ P. 23 class action on their own behalf and on behalf of classes for which he seeks certification.

170.    Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "Rule 23 RICO Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT A CLIENT LOCATION

171.    Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "Rule 23 Wage Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES
> THAT WORKED AT A CLIENT LOCATION

172.    Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "Rule 23 Colorado Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES
> THAT WORKED AT A CLIENT LOCATION IN COLORADO

173.    Pending any modifications necessitated by discovery, Plaintiffs preliminarily define a sub-class to the Rule 23 Wage Class (the "Rule 23 Westin Subclass") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE WESTIN DIA (8300 PEÑA BLVD,
> DENVER, CO 80249)

174.     The classes are so numerous that joinder of all potential class members is impracticable. Plaintiffs do not know the exact size of the classes since that information is within the control of Defendants. However Plaintiffs estimate that, based on the size of Xclusive's operations, the classes are composed of well over 1000 persons and each sub-class is composed of well over 50 persons. The exact size of the classes will be easily ascertainable from Defendants' records.

175.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include: Defendants' pay practices; Defendants' failure to pay employees all they are legally owed; the nature and extent of Defendant Astley's and Xclusive's fraud.

176.     The class claims asserted by Plaintiffs are typical of the claims of all the potential class members because they experienced the same or similar working conditions and pay practices as Defendants' other employees. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy. This is especially true in the case of low-wage, hourly, temporary workers, like the class members here, who are un-sophisticated, are unlikely to seek legal representation, cannot realistically navigate the legal system pro se, and whose small claims make it difficult to retain legal representation if they do seek it.

177.     Plaintiffs will fairly and adequately protect and represent the interests of the class. They were Defendants' employees and were victims of the same violations of law as the other class members, including numerous violations of federal and state wage and hour laws.

178.    Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in wage and hour class actions.

179.    The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

180.    Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and that the pertinent federal and state laws are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

181.    Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action, other than those currently pursuing their claims in *Valverde v. Xclusive Staffing, Inc., et al.*, 16-cv-00671-RM-MJW (D. Colo.).

182.    Plaintiffs are unaware of any pending litigation commenced by members of the classes concerning the instant controversy, other than *Valverde v. Xclusive Staffing, Inc., et al.*, 16-cv-00671-RM-MJW (D. Colo.).

183.    It is desirable to concentrate this litigation in this forum because all parties are domiciled in this jurisdiction, or are registered to do business in this jurisdiction.

184.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage claims to both class litigation and the use of representative testimony and representative documentary evidence.

185. The contours of the class will be easily defined by reference to the payroll documents Defendants were legally required to create and maintain. *See* 29 C.F.R. § 516 *et seq.*

## 29 U.S.C. § 216(b) COLLECTIVE ACTION ALLEGATIONS

186. Plaintiffs bring their FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and on behalf of all other similarly situated current and former employees of Defendants.

187. Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "216(b) National Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ANY ONE OF ITS
> SUBSIDIARES, THAT WORKED AT ONE OF ITS CLIENTS'
> LOCATIONS

188. Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "216(b) Colorado Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT A CLIENT LOCATION IN COLORADO

189. Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "216(b) Westin Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE WESTIN DIA (8300 PEÑA BLVD,
> DENVER, CO 80249)

190. All potential FLSA class members are similarly situated because, among other things, they were all hourly employees of Defendants and the members of the sub-classes were additionally all employed by Defendants. Moreover, all members of the class and sub-classes

suffered from the same policies of Defendants resulting in unpaid overtime in overtime workweeks, including:

    a.    Deductions for costs that are primarily for the benefit of the employer (including the $3.00 weekly deduction for the cost of issuing a pay check);

    b.    Xclusive's automatic deduction of 30-minutes of break time from every work day, regardless of whether the employees worked during the 30 minutes; and

    c.    Xclusive's "two paycheck" policy, under which employees who worked for different clients in the same week received a paycheck for each of those clients, calculating wages due based on the hours paid through each paycheck, and not paying overtime premiums for hours worked in excess of 40 if Xclusive worked less 40 hours or less at each of the client locations.

### COUNT I: CIVIL RICO, 18 U.S.C. 1964(c)

**All Named Plaintiffs and the Rule 23 RICO Class vs. Defendant Astley**

191.    As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

192.    Defendants Astley violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

193.    Defendant Astley and the Astley Enterprise engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), and which constitute patterns of racketeering.

194.    By conducting the Astley Enterprise through a pattern of racketeering, Defendant Astley injured Plaintiffs and those similarly situated.

195.    Among other things, each of these RICO violations caused Plaintiffs and those similarly situated to suffer loss of past, current, and prospective wages and to spend unpaid time working as opposed to pursuing other interests.

196.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

### **COUNT II: CIVIL RICO, 18 U.S.C. 1964(c)**

- **All Named Plaintiffs and the Rule 23 RICO Class vs. Defendant Xclusive**

197.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

198.    As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

199.    Xclusive violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

200.    Xclusive and the Xclusive Enterprise engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), and which constitute patterns of racketeering.

201.    By conducting the Xclusive Enterprise through a pattern of racketeering, Xclusive injured Plaintiffs and those similarly situated.

202.    Among other things, each of these RICO violations caused Plaintiffs and those similarly situated to suffer loss of past, current, and prospective wages and to spend unpaid time working as opposed to pursuing other interests.

203.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

### **COUNT III: THE FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 201, *et seq.***

- **All Named Plaintiffs and the 216(b) National Class against Defendants Xclusive, Xclusive Management, and Astley**
- **All Named Plaintiffs and the 216(b) Colorado Subclass against Defendants Xclusive, Xclusive Management, Xclusive Colorado, and Astley**
- **All Named Plaintiffs and the 216(b) Westin Subclass against Defendants Xclusive, Xclusive Management, Xclusive Colorado, Astley, and Westin.**

.

204.    Plaintiffs brings their FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and on behalf of all other similarly situated current and former employees of Defendants.

205.    All Defendants employed Plaintiffs and those similarly situated pursuant to the Fair Labor Standards Act.

206.    Each of Defendants are, or were members of, of an enterprise that had annual revenues in excess of $500,000 during Plaintiffs' employment and had two or more employees that handled goods or materials that had been moved in or produced for interstate commerce. Defendants were therefore part of an enterprise or enterprises engaged in commerce pursuant to 29 U.S.C. § 203(s)(1).

207.    As employers of Plaintiffs and those similarly situated, Defendants named in this claim were required to pay Plaintiffs and those similarly overtime pursuant to 29 U.S.C. § 207 and failed to do so.

208.    The failure to pay overtime was caused by the automatic 30-Minute Deduction Policy, the $3 Deduction Policy, and the Two Paycheck Policy.

209.    As employers of Plaintiffs and those similarly situated, Defendants named in this claim were required to pay Plaintiffs and those similarly situated their regular rate for meal breaks that were deducted from compensated time, but never given or taken, and failed to do so.

210.    The failure to pay as required by the FLSA was willful pursuant to 29 U.S.C. § 255(a).

211.    Plaintiffs and those similarly situated are therefore entitled to the following pursuant to

29 U.S.C. § 216:

      i.      unpaid overtime;

      ii.      gap time for any workweek in which overtime is owed;

      iii.      their regular rate, or overtime in overtime workweeks, for unpaid breaks;

      iv.      statutory liquidated damages;

      v.      reasonable attorney's fees and costs.

212.    As employers, Defendants are joint and severally liable to Plaintiffs and the 216(b)

classes.

## COUNT IV: FAILURE TO PAY STATUTORILY REQUIRED WAGES UNDER THE COLORADO WAGE CLAIM ACT ("CWCA"), § 8-4-101 ET SEQ., AND ANALOGOUS LAWS OF NEW MEXICO, KANSAS, LOUISIANA, INDIANA, KENTUCKY, OHIO, HAWAII, AND FLORIDA

- **All Named Plaintiffs and the Rule 23 Wage Class vs. Defendants Xclusive and Xclusive Management.**
- **All Named Plaintiffs and the Rule 23 Colorado Subclass against Defendants Xclusive, Xclusive Management, and Xclusive Colorado.**
- **All Named Plaintiffs and the Rule 23 Westin Subclass against Defendants Xclusive, Xclusive Management, Xclusive Colorado, and Westin.**

213.    As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all

those similarly situated pursuant to Fed. R. Civ. P. 23.

214.    Defendants Xclusive, Xclusive Management, Xclusive Colorado and Westin, employed

Plaintiffs and those similarly situated.

215.    Plaintiffs and those similarly situated worked for these Defendants as hourly employees

and these Defendants failed to pay Plaintiffs and those similarly situated for all hours worked.

216.     This unpaid time, including unpaid overtime, was caused by the 30-Minute Deduction

Policy, the 10 Minute Break Policy, and the Two-Check Policy.

217.     As such, these Defendants failed to pay all wages due under the law and therefore

violated state wage payment statutes, including Colo. Rev. Stat. § 8-4-101 *et seq.*

218.     Plaintiffs and those similarly situated are entitled to damages and attorneys' fees for their

unpaid time.

219.     Plaintiffs demand payment on behalf of themselves and all putative class members for

whom they bring this claim in an amount sufficient to provide compensation for all unpaid

wages. This demand for payment is continuing and is made on behalf of any putative lass

members whose employment has terminated or terminates at any time in the future or who have

been inadequately paid on any regular pay periods and who continue to be employed by these

Defendants. Such payment should be made care of undersigned counsel at undersigned counsel's

address, included in the signature block.

### COUNT V: FAILURE TO PAY STATUTORILY REQUIRED OVERTIME UNDER COLORADO LAW AND THE ANALOGOUS LAWS OF NEW MEXICO, KANSAS, INDIANA, KENTUCKY, OHIO, AND HAWAII

- **All Named Plaintiffs and the Rule 23 Wage Class vs. Defendant Xclusive Xclusive, and Xclusive Management.**
- **All Named Plaintiffs and the Rule 23 Colorado Subclass against Defendants Xclusive, Xclusive Management, and Xclusive Colorado.**
- **All Named Plaintiffs and the Rule 23 Westin Subclass against Defendants Xclusive, Xclusive Management, Xclusive Colorado, and Westin.**

220.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all

those similarly situated pursuant to Fed. R. Civ. P. 23.

221.     Defendants Xclusive, Xclusive Management, Xclusive Colorado and Westin, employed

Plaintiffs and those similarly situated.

222. Plaintiffs and those similarly situated worked for these Defendants as hourly employees and these Defendants failed to pay Plaintiffs and those similarly situated overtime for all hours worked in excess of 40 in a week.

223. The failure to pay overtime was caused by the 30-Minute Deduction Policy, the 10 Minute Break Policy, and the Two-Check Policy.

224. Therefore, Defendants failed to pay overtime pursuant to the relevant state statutes and regulations, including Colo. Rev. Stat. § 8-6-118 and the Colorado Wage Order.

225. Plaintiffs and those similarly are owed overtime premiums and any applicable damages, penalties, or attorneys' fees under those protections and the CWCA, Colo. Rev. Stat. § 8-4-101, *et seq.*

226. Plaintiffs demand payment on behalf of themselves and all putative class members for whom they bring this claim in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing and is made on behalf of any putative class members whose employment has terminated or terminates at any time in the future or who have been inadequately paid on any regular pay periods and who continue to be employed by these Defendants. Such payment should be made care of undersigned counsel at undersigned counsel's address, included in the signature block.

## COUNT VI: FAILURE TO PROVIDE 10 MINUTE BREAKS UNDER COLORADO LAW

- **Plaintiffs and the Rule 23 Colorado Wage Sub-Class vs. Defendant Xclusive**
- **Plaintiffs and the Rule 23 Westin Subclass against Defendant Westin**

227. As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

228.    Defendants Xclusive, Xclusive Management, Xclusive Colorado and Westin, employed Plaintiffs and those similarly situated.

229.    Plaintiffs and those similarly situated were covered by The Colorado Wage Order, which provides that "[a] compensated ten (10) minute rest period for each four (4) hours or major fractions thereof shall be permitted for all employees." These Defendants employed Plaintiffs and those similarly situated and failed to provide these rest breaks.

230.    Plaintiffs and the Rule 23 Colorado Wage Sub-Class are entitled to compensation for these lost breaks pursuant to Colo. Rev. Stat. §§ 8-4-101 *et seq.*, 8-6-101 *et seq.*, and the Colorado Wage Order.

231.    Plaintiffs and those similarly situated are entitled to damages, penalties, and, if applicable, attorneys' fees.

232.    Plaintiffs demand payment on behalf of themselves and all putative class members for whom they bring this claim in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing and is made on behalf of any putative class members whose employment has terminated or terminates at any time in the future or who have been inadequately paid on any regular pay periods and who continue to be employed by these Defendants. Such payment should be made care of undersigned counsel at undersigned counsel's address, included in the signature block.

### <u>COUNT VII</u>: ILLEGAL DEDUCTIONS UNDER COLORADO LAW

- **All Named Plaintiffs and the Rule 23 Colorado Wage Sub-Class vs. Defendant Xclusive**
- **Plaintiffs and the Rule 23 Westin Subclass against Defendant Westin**

233.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

234.     Defendants Xclusive, Xclusive Management, Xclusive Colorado and Westin, employed Plaintiffs and those similarly situated.

235.     The deductions taken from Plaintiffs' paychecks by these Defendants described above, including the $3 per pay check deduction, violated Colorado statute. Colo. Rev. Stat. § 8-4-105.

236.     These illegal deductions are recoverable under the Colorado Wage Claim Act. Colo. Rev. Stat. §§ 8-4-101 *et seq.*

237.     Plaintiffs and those similarly situated are entitled to damages and attorneys' fees.

238.     Plaintiffs demand payment on behalf of themselves and all putative class members for whom they bring this claim in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing and is made on behalf of any putative class members whose employment has terminated or terminates at any time in the future or who have been inadequately paid on any regular pay periods and who continue to be employed by these Defendants. Such payment should be made care of undersigned counsel at undersigned counsel's address, included in the signature block.

### <u>COUNT VIII</u>: BREACH OF CONTRACT, OR ALTERNATIVELY CONTRACT IMPLIED IN LAW, UNDER THE LAWS OF COLORADO, NEW MEXICO, TEXAS, KANSAS, LOUISIANA, INDIANA, TENNESSEE, KENTUCKY, OHIO, HAWAII, AND FLORIDA

- **All Named Plaintiffs and the Rule 23 Wage Class vs. Defendant Xclusive.**
- **All Named Plaintiffs and the Rule 23 Colorado Subclass against Defendant Xclusive.**

239.     As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

240.     Defendant Xclusive entered into hourly employment contracts with all Plaintiffs and those similarly situated.

241.     A material term of all of these contracts was that Plaintiffs and those similarly situated would be paid an hourly wage for all hours worked.

242.     Defendant Xclusive also entered into hourly implied-in-fact contracts with Plaintiffs and those similarly situated incorporating state and federal wage and hour laws.

243.     Defendants breached the contract by, among other things, not compensating employees for all hours worked.

244.     Defendants breached the implied in fact contract by, among other things, not compensating employees for overtime for all hours worked in excess of 40 in a week.

245.     These breaches were caused by the 30-Minute Deduction Policy, the 10 Minute Break Policy, and the Two-Check Policy.

246.     Plaintiffs and those similarly situated suffered damages.

247.     In the alternative, if the contracts fail, the Defendants are liable to Plaintiffs and those similarly situated for contracts implied in law, including promissory estoppel and unjust enrichment.

248.     In particular, as a result of accepting work without providing proper compensation, Defendants received a benefit at the expense of Plaintiffs and those similarly situated under circumstances that would make it unjust for Defendants to retain the benefit without commensurate compensation. As a result, Plaintiffs and those similarly situated are entitled to damages for unjust enrichment.

## **DEMAND FOR JURY TRIAL**

249.   Plaintiffs demand a trial by jury for all issues so triable.

**PRAYER FOR RELIEF**

250.   Plaintiffs respectfully request an Order from this Court:

      d.     Certifying an opt-in class and sub-class pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.*;

      e.     Certifying the Rule 23 class and sub-classes, naming the named Plaintiffs as class representatives of the respective classes they seek to represent, and naming Plaintiffs' counsel class counsel;

      f.     granting judgment in favor of Plaintiffs and against all Defendants;

      g.     awarding Plaintiffs and the Rule 23 classes their actual damages and any applicable statutory damages;

      h.     awarding Plaintiffs and those similarly situated damages and liquidated damages under the FLSA;

      i.     awarding Plaintiffs and those similarly situated their costs;

      j.     awarding Plaintiffs and those similarly situated their attorneys' fees;

      k.     awarding Plaintiffs and those similarly situated prejudgment and post-judgment interest, when allowable by law; and

      l.     granting such other relief as this Court deems just and proper.

                    Respectfully Submitted,

                    s/Alexander Hood
                    Alexander Hood
                    David Seligman
                    Towards Justice
                    1535 High St., Suite 300
                    Denver, CO 80218

Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org
        david@towardsjustice.org

Attorneys for Plaintiffs